Filed 8/28/13

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>RONALD HENDERSON TURNER,<br><br>     Defendant and Appellant. | H037925<br>(Monterey County<br>Super. Ct. No. SS111816) |

After a high school football game on September 23, 2011, head coach Rafael Ward, and several other coaches, were accompanying their families to their cars for their protection because of a threat by defendant Ronald Henderson Turner, a parent of one of the players. Defendant called one of the coaches a racial slur and then said, "I'll see you after the game." Coach Ward told Lawrence Fenton, an off-duty probation officer providing security at the game, about the threat and that defendant had said he was going to carry out his threat after the game. A short time later, Ward told Officer Fenton that he (Ward) had learned from his aunt (who had heard it from an acquaintance of defendant) that defendant "had a gun on him." Officer Fenton called Salinas police for backup. His partner who was with him, Steve Hinze (also an off-duty probation officer), located defendant and (with the police) detained him at or next to the parking lot outside the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III and IV of the Discussion.

stadium. Defendant was handcuffed at gunpoint while officers determined whether he was armed. After admitting to a police officer that he had a gun, the police located a loaded revolver concealed on his person, and he was arrested.

After the denial of defendant's motion to suppress evidence pursuant to Penal Code section 1538.5, he pleaded no contest to possession of a firearm in a school zone.[1] The court suspended defendant's sentence and placed him on felony probation under various terms and conditions, including the condition that he serve 250 days in county jail.

Defendant challenges the court's denial of his suppression motion. He asserts that the officers based their conclusion that he was armed on unsubstantiated hearsay from an unknown source, and that this was, in essence, the kind of anonymous tip that the United States Supreme Court held in *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*) could not support an investigative stop. He makes several arguments, including (1) he was subjected to a de facto arrest without the officers' having probable cause at the time to believe he had committed a crime; and (2) even if there were no arrest, his detention was unjustified because the officers had no specific articulable facts to reasonably suspect that he was involved in illegal activity.

We conclude in the published portion of this opinion that the suppression motion was properly denied. Based upon the totality of the circumstances, (1) the officers' actions to determine whether defendant was armed were reasonably necessary for their protection and did not result in his de facto arrest; and (2) the officers had sufficient articulable facts to support their reasonable suspicion that defendant had committed a felony—namely, possession of a firearm in a school zone. Therefore, the investigative stop was constitutionally permissible. In the unpublished portion of this opinion, we

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2

reject defendant's claim for additional conduct credits under the latest amendment to section 4019, but agree that defendant's challenge to two probation conditions (involving possession and consumption of drugs and alcohol, and possession of firearms) has merit. Accordingly, we will order the probation conditions modified to include a requirement of defendant's actual knowledge of the possession and/or use of the specified items. We will affirm the order of probation as modified.

FACTS

A football game at Everett Alvarez High School in Salinas took place on the evening of September 23, 2011, between approximately 7:00 or 7:30 and 10:15 p.m. Rafael Ward and Anthony Stewart were two of the coaches on the team for which defendant's son played.[2] Ward testified that "there was a negative vibe [among the crowd] in general" during the game. Near halftime, one of the players had his leg broken, and the "negative vibe" became more intense.[3] At one point, defendant approached Ward on the field while he was talking to defendant's son. At that moment, defendant's son was angry and very upset with another coach. Defendant told Ward, " 'Coach, I was the one that told him to take a knee.' " Ward and defendant shook hands as defendant left the field; defendant did not threaten Ward  But Stewart told Ward that defendant had threatened him (Stewart). Stewart was upset and said that defendant "called him a 'bitch-ass [racial slur.] I'll see you after the game.' "

When the game concluded, a number of coaches walked their families to their cars because of security concerns. According to Ward, people in the crowd "came up to Coach Stewart and said, 'Hey, they said they're going to wait for you in the parking

---

[2] We infer from the record that Ward was the head coach, and Stewart was one of the assistant coaches.

[3] Ward testified that "[t]he crowd was chanting against our kids because we weren't taking a knee."

3

lot.' " Ward assumed that " 'they' " referred to defendant, who had threatened Stewart earlier.

As Ward was walking out of the stadium, his aunt, Annie Camel, approached him. She asked, " 'Hey, Ralph, what is going on with you and Spanky [defendant]?' " Because his aunt was "obviously worried," Ward tried to dispel her concern. Camel then told Ward: " 'Well, I'm just telling you [that] you need to be careful because I heard he had a gun,' or 'I heard he has a gun.' " She said that her friend, Jeannette Smith, " 'said he has a gun.' " The school principal, Darrin Herschberger, was nearby and overheard Ward and Camel.[4] Herschberger asked Ward to clarify who it was who had a gun, and Ward responded that they were referring to defendant.

Monterey County Probation Officers Fenton and Hinze were hired by the high school to provide additional security at the football game. (They wore shirts with badges, and carried service weapons.) After the game, Herschberger instructed Officer Fenton to go to the parking lot with Officer Hinze because one or more people in the crowd had threatened one of the coaches. While Officers Fenton and Hinze were together in the parking lot, Officer Fenton spoke to Ward. Officer Fenton testified that he "asked [Ward] . . . what was going on. He told me that a parent had come up to them during the game because he was upset about something that one of the coaches had said or done and threatened ['] to take care of it on the outs['] is the way it was said to me. At which point that's why the coaches had come out because they were concerned about their families

_____

[4] Jeanette Smith testified briefly at the suppression hearing. As a friend of defendant and an admittedly reluctant witness called by the prosecution, Smith testified on direct examination that she attended the game; observed the crowd having become upset at the coaches approximately halfway through the game; and heard some discussion (while in Camel's presence) about defendant possessing a gun. During her cross-examination and redirect, Smith testified that she heard the discussion about defendant having a gun after the game was over and was unsure whether it occurred before or after defendant was arrested.

getting hurt." Ward told Officer Fenton that the parent who had made the threat was the father of one of the players, Turner. Ward walked off and then came back and told Officer Fenton that "he had heard [that defendant] had a gun on him." Officer Fenton asked Ward how he knew this; Ward responded that "his aunt knew someone who knew [defendant] and said he had a gun on him."

Officer Fenton, in Officer Hinze's presence, then called the Salinas Police Department, indicating "that we had received a report of a person at the school with a gun" and requested "additional units to . . . provide cover and let us contact that person safely." Officer Fenton also obtained a description of defendant from a school official.

Officer Hinze testified that he had been with Officer Fenton and Principal Herschberger in the parking lot after the game; Officer Hinze was "about an arm's[-]length away or less" from Officer Fenton during this time. Officer Hinze described the situation of the crowd moving to get to their cars as "a little bit more chaotic than usual." Officer Fenton told him that there had been an incident during the game when a player was injured; there was "a possible threat"; and someone might have a gun. Officer Hinze did not know the specifics of the threat; only that "[i]t was something [that] was going to be taken care of in the parking lot . . ." Officer Hinze was provided with defendant's name as the person potentially having a gun; a school supervisor then radioed a physical description of defendant to the officer.

Officer Hinze observed six or seven people, including defendant, near a dumpster at the edge of the parking lot near the corner of Nantucket and Independence Streets. The officers had encountered this same group in the same location before the game. They were "standing . . . off to the side looking a little intimidating," and the coaches were escorting their families to the vicinity of the group. There were beer cans next to the group and "there was concern that this [was] supposedly the group that might [have made] a threat . . ." Approximately one minute after the arrival of the first marked police car in the parking lot, and as Officer Hinze received a physical description of defendant

5

over the radio, he observed defendant—from a distance of about 45 feet—break away from the group and walk off campus.

Officer Hinze then shone his flashlight on defendant, identified himself as " 'Probation,' " drew his service weapon, and directed defendant to put up his hands. [5] Officer Jordan White arrived—having responded to a police dispatch indicating that there was a man with a gun at the Everett Alvarez High School football game—and ordered defendant to the ground. Another police officer held defendant at gunpoint while Officer White approached and handcuffed him. Officer White asked defendant if he was carrying any weapons; defendant responded that he had a gun in his front pocket. Officer White reached into defendant's pocket and recovered a black short-barrel revolver that was loaded. [6]

## PROCEDURAL BACKGROUND

In an information filed November 9, 2011, defendant was charged with three felonies, namely, possession of a firearm in a school zone (§ 626.9, subd. (b); count 1); carrying a loaded, unregistered firearm (§ 12031, subd. (a)(1); count 2); and carrying a concealed firearm (§ 12025, subd. (a)(2); count 3). It was also alleged as an enhancement to count 1 that possession of a firearm in or on the grounds of a public or private school (K - 12) is punishable by imprisonment of two, three, or five years (§ 626.9, subd. (f)(1)).

---

[5] Shortly before defendant was stopped, a person was detained and searched by Officers Fenton and Hinze and Salinas Police Officer Jordan White. The person's clothing did not match the description of defendant's clothing, and the person was released. Simultaneously with Officer Hinze learning from a radio report that the detained person was not the person who was reportedly armed, the officer observed defendant and approached him.

[6] The record indicates that there was a second arrest after the game outside of the locker room involving Lenny Sanks (a relative of defendant), who had threatened Stewart and may have had a knife. Ward testified that he had seen Sanks with defendant during the game.

6

It was alleged further as enhancements to count 2 (§ 12031, subd. (a)(2)(f)) and count 3 (§ 12025, subd. (b)(6)) that defendant was not the registered owner of the firearm.

Defendant thereafter filed a motion to suppress evidence pursuant to section 1538.5, arguing that the property seized (i.e., the black revolver) should be suppressed because it was the product of an unlawful search and seizure. The motion was opposed by the People. After the presentation of evidence and argument on January 5 and 6, 2012, the court denied the suppression motion. Immediately after the court's ruling, defendant withdrew his not guilty plea, and entered a plea of no contest to count 1, conditioned upon the dismissal of the remaining counts and his receiving felony probation.[7] The court thereafter suspended imposition of sentence and granted defendant probation for three years on various terms and conditions, including the condition that he serve 250 days in the county jail with the court awarding him 130 days of custody credits and 64 days of conduct credits for a total of 194 presentence credits. Defendant filed a timely notice of appeal.

DISCUSSION

I.    Motion to Suppress

A.    Standard of Review

"An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these

---

[7] The record reflects that at the time of his change of plea in this case, defendant admitted the allegations in the petition that he had violated probation in a separate misdemeanor case (number MS276040). The court revoked probation, reinstated it on the original terms and conditions, and ordered defendant to serve 231 days in county jail with credits for an equal number of days, thereby deeming the jail sentence served.

inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." (*People v. Williams* (1988) 45 Cal.3d 1268, 1301; see also *People v. Ayala* (2000) 23 Cal.4th 225, 255.)

In reviewing the denial of a motion to suppress, we examine "the record in the light most favorable to the trial court's ruling." (*People v. Jenkins* (2000) 22 Cal.4th 900, 969.) All presumptions favor the trial court's exercise of its power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence, and draw factual inferences, " 'and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.' " (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597, quoting *People v. Lawler* (1973) 9 Cal.3d 156, 160; see also *In re Lennies H.* (2005) 126 Cal.App.4th 1232, 1236.) Where there is no controversy concerning the underlying facts—as is the case here—our task is simplified: The only issue is whether that rule of law, as applied to the undisputed historical facts, was or was not violated. This is an issue for our independent review. (See *People v. Thompson* (2006) 38 Cal.4th 811, 818.)

### B. Detentions Under the Fourth Amendment

The legal basis upon which a peace officer may detain a citizen has been explained as follows: "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893, superseded on other grounds by Cal. Const., art. I,

8

§ 28.)[8] "The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]" (*In re Tony C.*, at p. 893, citing *Terry v. Ohio* (1968) 392 U.S. 1, 22 (*Terry*).) The fact that there exists "[t]he possibility of an innocent explanation [for the suspect's activity] does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." (*In re Tony C.*, at p. 894.) The reasonableness of the officer's suspicion is determined by what he or she knows before any search occurs. (*J.L.*, *supra*, 529 U.S. at p. 271.) And when a detention is constitutionally justified, if the officer has a reasonable suspicion that the person is armed and dangerous, the officer may pat search the detainee for weapons. (*Terry*, at p. 30.)

In determining the lawfulness of a temporary detention, courts look at the " 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (*United States v. Arvizu* (2002) 534 U.S. 266, 273, quoting *United States v. Cortez* (1981) 449 U.S. 411, 417; see also *People v. Souza* (1994) 9 Cal.4th 224, 239.) A balancing test is used to determine the constitutional validity of the detention: "The reasonableness of seizures that are less intrusive than a traditional arrest, [citations], depends ' "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." ' [Citations.] Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public

---

[8] "Since the passage of Proposition 8 in 1982 (Cal. Const., art. I, § 28), the subjective belief of the citizen set out in *In re Tony C.*[, *supra*,] 21 Cal.3d 888, no longer applies in analyzing whether an encounter is a detention. [Citation.] Rather the federal standard of analyzing the objective facts of the incident controls. [Citation.]" (*In re Christopher B.* (1990) 219 Cal.App.3d 455, 460, fn. 2, citing *In re Lance W.* (1985) 37 Cal.3d 873.)

interest, and the severity of the interference with individual liberty. [Citation.]" (*Brown v. Texas* (1979) 443 U.S. 47, 50-51; see also *United States v. Hensley* (1985) 469 U.S. 221, 228 [test, based upon reasonableness standard under Fourth Amendment, "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion."].)

The standard of " 'reasonable suspicion' . . . [is one] less demanding than probable cause 'not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.' " (*People v. Souza, supra*, 9 Cal.4th at pp. 230-231, quoting *Alabama v. White* (1990) 496 U.S. 325, 330.) The United States Supreme Court has noted, "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' [Citation.]" (*United States v. Sokolow* (1989) 490 U.S. 1, 7-8, quoting *Illinois v. Gates* (1983) 462 U.S. 213, 232.) Our high court has explained: "Although each case must be decided on its own facts, . . . [t]he guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution [citations] is 'the reasonableness of the particular governmental invasion of a citizen's personal security.' [Citation.]" (*In re Tony C.*, *supra*, 21 Cal.3d at p. 892, quoting *Terry*, *supra*, 392 U.S. at p. 19.)

II.    Defendant's Motion to Suppress

Defendant's motion to suppress involves dual, alternative contentions. First, defendant argues that the officers' action of handcuffing him at gunpoint was not a detention for which they would have needed a reasonable suspicion of criminal activity; rather, it constituted a de facto arrest, and the officers had no probable cause that defendant had committed a crime. Second, he argues that even were we to conclude that he was not arrested, his detention was unlawful because the detaining officers did not

10

have specific articulable facts upon which they could have reasonably suspected that he was involved in illegal activity. We address these two contentions below.[9]

### A. There Was No De Facto Arrest

Defendant claims that because his handcuffing at gunpoint during the encounter with the officers was not reasonably necessary, he was subjected to a de facto arrest. He bases this contention on the assertion that the officers could not have reasonably concluded that he was armed because "the source of the information was an unreliable anonymous tip." We reject this argument.

An investigative detention, while its scope may vary depending on the individual circumstances, "must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. [Citations.]" (*Florida v. Royer* (1983) 460 U.S. 491, 500.) Law enforcement's purpose for the stop as well as the reasonable length of time necessary for the investigation should be considered in evaluating whether the intrusion is unreasonable and therefore a de facto arrest. (*United States v. Sharpe* (1985) 470 U.S. 675, 685.) There is no " 'bright line' rule," and there "may in some instances [be] difficult line-

---

[9] Defendant also addresses at some length the People's contention below that the detention was justified because, under *New Jersey v. T.L.O.* (1985) 469 U.S. 325 (*T.L.O.*), there was a reduced expectation of privacy in a public school setting. In *T.L.O.*, the United States Supreme Court recognized an exception to the warrant and probable cause requirement for searches conducted by public school officials. In respondent's brief, the Attorney General cites *T.L.O.* and acknowledges the argument made by the People below, but she does not affirmatively make that argument here. Since the argument has not been made on appeal, and we will conclude, *post*, that the suppression motion was properly denied, we need not address this contention. (See *People v. Jenkins*, *supra*, 22 Cal.4th at p. 980, fn. 12 [where suppression motion was properly denied based on third-party consent, appellate court declined to consider other claimed justifications for such denial].)

drawing problems in distinguishing an investigative stop from a de facto arrest." (*Ibid.*; see also *People v. Celis* (2004) 33 Cal.4th 667, 674-675 (*Celis*).)

A detention at gunpoint is a factor that obviously increases its intrusiveness; in some instances, this factor may result in the encounter being deemed an arrest that must be supported by probable cause, while in other instances, it may be found an appropriate element of the detention. (*People v. Glaser* (1995) 11 Cal.4th 354, 366.) Similarly, handcuffing a suspect does not necessarily convert a detention into a de facto arrest. (*Celis*, *supra*, 33 Cal.4th at p. 675; see also *In re Antonio B.* (2008) 166 Cal.App.4th 435, 441.)

In *Celis*, the defendant, who was suspected of drug trafficking, claimed that he was subjected to a de facto arrest because he was detained outside his house at gunpoint, handcuffed, and required to sit on the ground for several minutes while officers walked through his house to ensure that there was no one inside posing a danger. (*Celis*, *supra*, 33 Cal.4th at p. 674.) In rejecting this claim, the court explained: "With regard to the scope of the police intrusion, stopping a suspect at gunpoint, handcuffing him, and making him sit on the ground for a short period, as occurred here, do not convert a detention into an arrest. [Citations.]" (*Id.* at p. 675.)[10] It explained that while such actions by officers would rarely be justified for a routine traffic stop, they "may be appropriate when the stop is of someone suspected of committing a felony." (*Id.* at

---

**10** Among the cases cited by the high court after the above-quoted passage in which the appellate courts concluded that the officers' conduct in detaining the suspect was not so intrusive or unreasonable as to have effected a de facto arrest are *People v. Soun* (1995) 34 Cal.App.4th 1499, 1517, in which the defendant "was removed from the car at gunpoint by a large number of police officers, was forced to lie on the ground, was handcuffed and placed in a patrol car, was transported from the site of the stop a distance of three blocks to a parking lot," where he was held for 30 minutes; and *In re Carlos M.* (1990) 220 Cal.App.3d 372, 384, where officers, over a 30-minute period, handcuffed the defendant, and drove him to the hospital for identification by a rape victim.

12

p. 676; see also *People v. Stier* (2008) 168 Cal.App.4th 21, 27 [officers' handcuffing of suspect during detention generally held permissible only "where the police officer has a reasonable basis for believing the suspect poses a present physical threat or might flee"].)

Here, defendant was suspected of committing a felony—possession of a handgun on school property in violation of section 626.9, subdivision (b).[11] Officer Hinze also understood that defendant had threatened a coach and had reportedly said that he intended to carry out that threat outside the stadium after the game. These circumstances justified Officer Hinze's initial detention of defendant at gunpoint to safely ascertain whether defendant was carrying a firearm. The actions then taken by Officer White in furtherance of the investigative detention—also drawing his service weapon, ordering defendant to the ground, and handcuffing him—were likewise reasonable and appropriate in order to safely determine whether defendant was armed. (See, e.g., *United States v. Greene* (9th Cir. 1986) 783 F.2d 1364, 1368 [detention of the defendant and companion by officers with guns drawn reasonable where informant had indicated she had seen firearm in motel room of two men she described].) And it is apparent that the duration of the detention was brief, another important factor militating against concluding that defendant was subjected to a de facto arrest. (*Celis*, *supra*, 33 Cal.4th at p. 675.) Moreover, as we will discuss (see pt. II.B., *post*), there were sufficient articulable facts upon which the officers reasonably concluded that defendant was armed. Officers Hinze and White "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."

---

[11] "Any person who possesses a firearm in a place that the person knows, or reasonably should know, is a school zone, as defined in paragraph (1) of subdivision (e), unless it is with the written permission of the school district superintendent, his or her designee, or equivalent school authority, shall be punished as specified in subdivision (f)." (§ 626.9, subd. (b).) Subdivision (f) of section 626.9 makes the offense of possession of a firearm on school property punishable "by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or five years."

13

(*United States v. Hensley*, *supra*, 469 U.S. at p. 235.)  Accordingly, we reject defendant's assertion that the officers' actions constituted a de facto arrest.

### B.     The Detention Was Lawful

#### 1.     *J.L.*, *People v. Wells*, and *People v. Dolly*

Defendant relies principally upon *J.L.*, *supra*, 529 U.S. 266 in contending that his detention was unlawful because of the absence of facts supporting a reasonable suspicion of illegal activity.  He argues that the basis for his detention by Officer Hinze was the "type of non-specific information . . . akin to an unreliable anonymous tip" which the Supreme Court declared in *J.L.* to be insufficient.  He also asserts that *People v. Dolly* (2007) 40 Cal.4th 458 (*Dolly*)—in which the California Supreme Court, distinguishing *J.L.*, found lawful a detention that was based in part upon an anonymous tip—further supports his position that there was no reasonable suspicion supporting his detention.

In *J.L.*, an anonymous caller reported to the police that a young Black male wearing a plaid shirt standing at a particular bus stop was carrying a gun.  (*J.L.*, *supra*, 529 U.S. at p. 268.)  After an undisclosed period of time elapsed after receiving the tip, the police went to the bus stop, saw three Black males, and noted that the juvenile, J.L., was wearing a plaid shirt.  (*Ibid.*)  Based upon the anonymous tip, one of the officers contacted J.L., instructed him to put up his hands, and frisked him, finding a concealed gun.  (*Ibid.*)  The Supreme Court concluded that there were insufficient facts to support a reasonable suspicion that the juvenile was armed, because "the officers' suspicion . . . arose not from any observations of their own but *solely* from a call made from an unknown location by an unknown caller."  (*Id.* at p. 270, italics added.)  While the court acknowledged that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop' " (*ibid.*, quoting *Alabama v. White* (1990) 496 U.S. 325, 327), it concluded that a reasonable suspicion that the juvenile was armed could not be based upon "the bare report of an unknown, unaccountable informant who neither

14

explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." (*J.L.*, at p. 271.)

In concluding that the uncorroborated anonymous tip did not support a reasonable suspicion of illegal activity, the Supreme Court rejected the State of Florida's argument that there should be "an automatic firearm exception to [the court's] reliability analysis," which the court held "would rove too far [in that it] would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." (*J.L.*, *supra*, 529 U.S. at p. 272.) But it acknowledged that there might be some circumstances—such as a report of someone carrying a bomb—in which the exigencies might justify the investigative stop "even without a showing of reliability." (*Id.* at p. 273.)

The California Supreme Court has distinguished *J.L.* in two subsequent cases upholding the constitutionality of detentions of suspects that were based in part upon anonymous tips. The reported criminal activity in the two cases involved suspected drunk driving (*People v. Wells* (2006) 38 Cal.4th 1078 (*Wells*)), and an assault with a firearm (*Dolly*, *supra*, 40 Cal.4th 458).

In *Wells*, the court addressed whether an anonymous, "uncorroborated phoned-in tip that accurately describe[d] the vehicle and its location and relate[d] that a possibly intoxicated person [was] behind the wheel, 'weaving all over the roadway' " justified an officer's initiation of a traffic stop. (*Wells*, *supra*, 38 Cal.4th at p. 1081.) Less than a year later, in Dolly, our high court described its holding in *Wells* as follows: "After balancing the public interest in safety and the individual's right to personal security free from arbitrary interference by law enforcement officers [citation], . . . the relative urgency presented by drunk or erratic drivers could justify an investigatory detention based on an anonymous tip despite the absence of corroborating evidence of illegal activity." (*Dolly*, *supra*, 40 Cal.4th at p. 464.)

15

In finding the officers' conduct reasonable, the court in *Wells* distinguished *J.L.* on several bases. It explained that the tip concerning erratic driving was more reliable than *J.L.*'s anonymous tip of a concealed firearm "because the informant presumably was an eyewitness to illegal activity," and the police could corroborate the tip by locating the described vehicle. (*Wells*, *supra*, 38 Cal.4th at p. 1086.) It observed further that questions about the reliability of the tip, by its very nature, were reduced because it was "a phoned-in report regarding a contemporaneous event of reckless driving presumably viewed by the caller." (*Id.* at p. 1087.) Second, the tip included an accurate description of the vehicle and its location which was confirmed within minutes by the officer. (*Wells*, at p. 1088.) Third, the reported crime was qualitatively more serious than the crime reported in *J.L.*: "[A] report of a possibly intoxicated highway driver, 'weaving all over the roadway,' poses a far more grave and immediate risk to the public than a report of mere passive gun possession." (*Wells*, at p. 1087.) Fourth, the traffic stop was less intrusive than the police search on a public street in *J.L.* (*Wells*, at p. 1087.) Based upon "the totality of the circumstances," the court concluded that the officer had a reasonable suspicion for initiating the traffic stop. (*Id.* at p. 1088.)

In *Dolly*, *supra*, 40 Cal.4th at page 462, our high court considered whether officers were justified in conducting an investigative detention based upon two 911 calls from a person reporting that he had just been assaulted with a gun by a light-skinned Black male with a bandage over his left hand who had mentioned the name of a gang. The caller, who stated he would not talk to the police because he would be killed for " 'snitching,' " said the assailant was sitting in the driver's seat of a car, and he described the car and its location. (*Ibid.*) Based upon this tip, the police went to the location; observed a car matching the description provided by the caller; identified the defendant in the driver's seat who had a cast on his left arm; ordered him to exit the car and to lie down in the street; and found a loaded revolver under the front passenger seat. (*Ibid.*)

16

The court in *Dolly* held that the anonymous tip by the presumed assault victim was sufficiently reliable to justify the defendant's detention.  (*Dolly*, *supra*, 40 Cal.4th at p. 471.)  It distinguished *J.L.* on the grounds that the nature of both the tips and the reported crimes in the two cases were significantly different.  (*Dolly*, at pp. 465-469.)  The court observed that the contemporaneous tip was at least as reliable as the phoned-in tip in *Wells*; in fact the tip in *Dolly* "bore stronger indicia of reliability" because it was a taped 911 call, presenting a greater possibility that the police could identify the caller.  (*Dolly*, at pp. 467.)[12]  And the court found that the tipster accurately and contemporaneously described the suspect and his location which the police confirmed within minutes and provided a plausible reason for not identifying himself.  (*Dolly*, at pp. 468-469; see also *In re Richard G.* (2009) 173 Cal.App.4th 1252, 1257-1258 [detention upheld based on anonymous tip to police—that was at least as reliable as tip in *Dolly*—of contemporaneous late-night disturbance involving firearm in front of described house in gang territory which included description of people and their apparel].)

The court in *Dolly* reasoned further that the report of "pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk not only to the caller but to anyone nearby.  [Citation.]"  (*Dolly*, *supra*, 40 Cal.4th at p. 465.)  It

---

[12] The high court also identified a policy reason for giving some weight to the reliability of a 911 call reporting a contemporaneous crime:  " 'There is the equal danger, moreover, that according no weight to "anonymous" tips in the reasonable suspicion calculus will undermine the ability of concerned residents to report illegal activity and to thereby make their neighborhoods more safe.  Residents of neighborhoods are in the best position to monitor activity on the streets.  But residents, also fearful of the consequences, may not always wish to identify themselves and volunteer their names.  According no weight as a matter of law to such "anonymous" tips would only discourage concerned residents from even calling the police, would burden the rights of ordinary citizens to live in their neighborhoods without fear and intimidation, and would render citizens helpless in their efforts to restore safety and sanctity to their homes and communities.' [Citation.]"  (*Dolly*, *supra*, 40 Cal.4th at p. 468, quoting *U.S. v. Perkins* (4th Cir. 2004) 363 F.3d 317, 326., fn. omitted.)

contrasted these circumstances with those in *J.L.*, where "[a]n allegation concerning the possession of a concealed weapon, 'without more' (*J.L.*, 529 U.S. at p. 268), does not present an emergency situation involving an immediate danger to human life." (*Dolly*, at pp. 465-466.) Our high court explained: "In our view, the interest in protecting human life, even if insufficient in this case to dispense entirely with the need to demonstrate the anonymous tip's reliability [citation], is nonetheless an important factor to consider in assessing the requisite level of reliability. [Citation.]" (*Id.* at p. 466.)

2. Defendant's Detention Was Reasonable

In our consideration of the legality of the detention here, we consider "the totality of the circumstances" (*Wells*, *supra*, 38 Cal.4th at p. 1088) and balance "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. [Citation.]" (*Brown v. Texas*, *supra*, 443 U.S. at p. 51; see also *Dolly*, *supra*, 40 Cal.4th at p. 464 [court balances "the public interest in safety and the individual's right to personal security free from arbitrary interference by law enforcement officers"].) In implementing this test, we conclude that *J.L.* is distinguishable and that there were sufficient articulable facts giving rise to a reasonable suspicion that justified the officers' detention of defendant.

Unlike in *J.L.*, this is not a case in which the original tipster's identity is unknown and he or she therefore cannot be held accountable to the police. The informant here was Ward, who told Officer Fenton (in Officer Hinze's presence) that his aunt "knew someone who knew [defendant] and said he had a gun on him." Thus, although the ultimate source that defendant was armed was not disclosed, Ward, unlike the anonymous tipster in *J.L.*, was a known individual communicating the tip. He—like a known informant providing a tip to the police—had a "reputation [that could] be assessed and who [could] be held responsible if [his] allegations turn out to be fabricated." (*Id.* at p. 270; see also *id.* at p. 276 (conc. opn. of Stevens, J.) [where "informant places his

18

anonymity at risk," court may consider this factor in assessing tip's reliability].) Thus, we are not faced here with the inherent unreliability "of an unknown, unaccountable informant" as found in *J.L.* (*id.* at p. 271). Further, the tip concerned a named individual, defendant, whereas the suspect in *J.L.* was described as a young Black male wearing a plaid shirt. (*Id.* at p. 268.)[13]

Additionally, Officer Hinze's decision to detain defendant was based on more than Ward's statement that he had heard defendant was carrying a gun. Officers Fenton and Hinze, who were together patrolling the parking lot, had been informed that defendant had threatened a coach; he had said that he would carry out that threat after the game outside the stadium, or, in Officer Hinze's words, "[i]t was something that was going to be taken care of in the parking lot"; and the threat was taken seriously by the coaches, who accompanied their families to their cars for their protection.[14]

---

[13] As our high court has explained, a tip's reliability need not be determined solely by whether it is predictive of the suspect's future behavior or whether it is subject to corroboration. (*Dolly, supra,* 40 Cal.4th at p. 464; see also *id.* at p. 470 [rejecting "rigid" approach to assessing tip's reliability].)

[14] Defense counsel at oral argument contended that, regardless of the information Officer Fenton had received, *Officer Hinze* did not have sufficient facts supporting a reasonable suspicion to detain defendant. Counsel asserted that, because Officer Hinze was only aware of a threat made by an unspecified parent and that defendant was reported as having a gun, his information was insufficient to justify stopping defendant. We reject this argument for two reasons. First, it ignores the following testimony given by Officer Hinze during cross-examination about what he overheard when Ward was speaking to Officer Fenton: "Q. . . . So the coach said he had a conflict on the football field with a parent and that his aunt believed he had a gun on his person? [¶] A. Correct. [¶] Q. . . . And Coach Ward also said that the parent threatened to take care of him after the game in the parking lot, is that correct? A. Correct." There was thus a link between the threat and the gun—both involving defendant—that defense counsel argued was missing. Second, although it was Officer Fenton who spoke to Ward twice—during which Ward said that defendant had threatened a coach and that he (Ward) had heard that defendant "had a gun on him"— Officer Hinze was standing next to Officer Fenton at the time at a distance of an arm's-length or less. Giving appropriate deference to the trial court's express and implied factual findings, including its responsibility to weigh the

*(continued)*

Further, Officer Hinze, before detaining him, saw defendant congregating at the edge of a parking lot where there were strewn beer cans with five or six other people who had been seen in the same location before the game, and who "look[ed] a little intimidating." Defendant broke away from the group and headed off campus very shortly after a marked police car arrived, action which the trial court found as "adding to the suspicious activity of the defendant." While such evidence of flight, of itself, is not sufficient to justify an investigative stop, it "is a proper consideration—and indeed can be a key factor—in determining whether in a particular case the police have sufficient cause to detain." (*People v. Souza*, *supra*, 9 Cal.4th at p. 235; see also *U.S. v. Mayo* (4th Cir. 2004) 361 F.3d 802, 807-808.) [fact that "upon seeing the police, Mayo sought to evade their scrutiny" was one factor supporting reasonable suspicion to detain suspect].) There was therefore significantly more evidence than "the bare report" of possible gun possession (*J.L.*, *supra,* 529 U.S. at p. 270) supporting Officer Hinze's reasonable suspicion that defendant was engaged in illegal activity to justify the detention.

Defendant argues, however, that Officer Hinze's testimony that he understood that "something was going to be taken care of in the parking lot" is vague and does not suggest criminal behavior (i.e., a planned assault) supporting the detention. We disagree. In the context of what was made known to Officer Hinze—including the prior threat upon the coach by defendant, and the fact that coaches were accompanying their families to their cars to ensure their safety—the officer could have reasonably believed that defendant was going to carry out his threat after the game in the parking lot. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 969.) And the fact that "something was going to be taken

evidence and draw appropriate factual inferences (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 969; *People v. Leyba*, *supra*, 29 Cal.3d 596), there is substantial evidence that Officer Hinze heard the substance of the conversations between Ward and Officer Fenton and thus understood that it was defendant who was both the source of the threat and was reported to be carrying a gun.

care of in the parking lot" may have a noncriminal meaning as well as a criminal one is not a basis for ignoring this evidence in evaluating whether there were articulable facts supporting a reasonable suspicion to detain defendant. (*In re Tony C.*, *supra*, 21 Cal.3d at p. 894.)

Moreover, considering, as part of the balance, "the gravity of the public concerns served by the seizure" (*Brown v. Texas*, *supra*, 443 U.S. at p. 51), there was a significantly greater threat to public safety than the reported conduct involved in *J.L.* The threat in *J.L.* was "a report of mere passive gun possession." (*Wells*, *supra*, 38 Cal.4th at p. 1087.) Here, the reported gun possession on public high school grounds—a felony (§ 626.9, subd. (b))—occurring during the crowded conditions of a football game was coupled with a report that the armed person had threatened a coach and had indicated he would carry out the threat after the game. As the court found in *Dolly*, the report of "pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk not only to the caller but to anyone nearby" (*Dolly*, *supra*, 40 Cal.4th at p. 465), and presented exigent circumstances unlike those in *J.L.*, where, in contrast, "[a]n allegation concerning the possession of a concealed weapon, 'without more' (*J.L.*, 529 U.S. at p. 268), does not present an emergency situation involving an immediate danger to human life." (*Dolly*, at pp. 465-466.) Consistently with our high court's conclusions regarding the severity of the reported crimes in both *Wells* and *Dolly*, the reported circumstances here presented a grave and immediate risk to the public. (See *Dolly*, at p. 465; *Wells*, at p. 1087; see also *U.S. v. Wooden* (7th Cir. 2008) 551 F.3d 647, 650 ["a need for dispatch can make reasonable a stop that would not be reasonable if the police had time to investigate at leisure"].)

We acknowledge that the intrusion to defendant in being publicly detained and handcuffed at gunpoint may have been greater than the traffic stop at issue in *Wells*, *supra*, 38 Cal.4th 1078. But the intrusiveness of the stop is only one of the factors to consider in determining whether the detention was reasonable, as seen, for example, in

*Dolly*, where the defendant was ordered out of his car located on a city street in the middle of the afternoon and instructed to lie down in the street with his hands at his side. (*Dolly*, *supra*, 40 Cal.4th at p. 462.)

*People v. Coulombe* (2000) 86 Cal.App.4th 52 (*Coulombe*) is instructive. In that case, during a "First Night" New Year's Eve celebration, police received nearly simultaneous tips from two separate people (from whom police did not obtain identifying information) that a man wearing white cap in a specified restaurant had a gun. (*Id.* at pp. 54-55.) Based upon this information, police located and approached the defendant, who was wearing a white cap and was sitting in a wheelchair in the area the witnesses described. (*Id.* at p. 55.) One officer asked the defendant if he was armed, and he responded that he was not, but clutched his right pants pocket; the officer placed his hand over the defendant's hand, pat-searched him, and found a revolver. (*Ibid.*) The appellate court held that the trial court erred in granting the defendant's suppression motion. It concluded that *J.L.*, *supra*, 529 U.S. 266, was distinguishable, because in *Coulombe*, there were multiple tips and the tipsters contacted the police in person, and they thus "subjected themselves to scrutiny and the risk of losing their anonymity." (*Coulombe* at p. 58.) It also held that the circumstances of alleged gun possession were very different from those in *J.L.*, because "the possession occurred not at a bus stop with only two of the suspect's friends present, but rather in a throng of thousands of New Year's Eve celebrants. The danger presented was thus much increased." (*Coulombe*, at p. 58, fn. omitted.)

As was the case with the tipsters in *Coulombe*, Ward made himself the subject of potential scrutiny by the police; there may have been repercussions to him had his tip, learned through his aunt, ultimately been unfounded. Further, as was true in *Coulombe*, the risk was much greater than the risk in *J.L.* Here, there was a crowd of people leaving the football game and there was, in addition to gun possession, a report that defendant had threatened a coach and intended to follow up on the threat after the game. We concur

22

with the *Coulombe* court's comment, and find it equally applicable here: "We see no other reasonable course of action [the officers] could have taken to make that determination, without risking injury to themselves or those in the surrounding crowd, other than the one they engaged in." (*Coulombe*, *supra*, 86 Cal.App.4th at pp. 59-60.)

Therefore, based upon the totality of the circumstances, we conclude that there were sufficient articulable facts to support a reasonable suspicion that defendant was armed, justifying his detention.

C.    The Motion to Suppress Was Properly Denied

The actions taken by the officers over a brief period of time in holding defendant at gunpoint, ordering him to the ground, and handcuffing him were, under the circumstances, reasonably necessary in their investigation to determine whether defendant was armed. Their conduct was not so intrusive or unreasonable as to have constituted a de facto arrest. *J.L.* is factually distinguishable and does not compel the conclusion that the detention here was unlawful. After balancing the societal interest served by the detention against the individual's " 'right to personal security free from arbitrary interference by law officers' " (*Brown v. Texas*, *supra*, 443 U.S. at p. 50), we conclude that the detention here was constitutionally permissible.

In reaching these conclusions, we cannot ignore that the reported crime here of carrying a concealed, loaded firearm serves as a grim reminder of the numerous mass shootings that have occurred in schools in the past decade or so, including: Columbine High School in 1999; Santana High School in 2001; Red Lake Senior High School in 2005; West Nickel Mines Amish School in 2006; Virginia Tech University in 2007; Northern Illinois University in 2008; University of Alabama (Huntsville) in 2010; Millard South High School in 2011; Chardon High School, Oikos University, and Sandy Hook Elementary School in 2012; Taft Union High School, Hazard Community and Technical College, and Santa Monica College in 2013. While the constitutional protections against unreasonable searches and seizures do not yield to public safety,

23

neither is the Fourth Amendment an obstacle to vigilant security measures, such as detentions of suspects, taken to prevent mass violence (or violence of any kind) as long as the facts known to the officer(s) support a reasonable suspicion of criminal activity. Those facts existed here, and the motion to suppress was properly denied.

III.     Claim of Additional Conduct Credits Under Section 4019

A.      Forfeiture of Appellate Claims

Defendant asserts both equal protection and statutory challenges concerning the trial court's calculation of conduct credits under section 4019.  He claims, inter alia, that he is entitled to conduct credits under the more favorable scheme available under an amendment to section 4019 that became effective October 1, 2011.  He concedes that he did not assert these challenges below.  For this reason, we conclude that his appellate claims are forfeited.

" ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." [Citation.]' [Citation.]" (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590, quoting *United States v. Olano* (1993) 507 U.S. 725, 731.)  The purpose of the forfeiture doctrine " 'is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had. . . .' " (*People v. Walker* (1991) 54 Cal.3d 1013, 1023, overruled on another ground in *People v. Villalobos* (2012) 54 Cal.4th 177, 183.)

Our high court has applied the doctrine of forfeiture in a variety of contexts to bar claims not preserved in the trial court in which the appellant had asserted an abridgement of fundamental constitutional rights.  (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 250; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1116, fn. 20.)  Courts in a number of instances have found that the appellant's unpreserved equal protection claims were forfeited.  (See, e.g., *People v. Alexander* (2010) 49 Cal.4th 846, 880, fn. 14; *People v.*

*Burgener* (2003) 29 Cal.4th 833, 861, fn. 3.) And the forfeiture doctrine applies to the area of sentencing. (*People v. Scott* (1994) 9 Cal.4th 331, 351; see also *People v. Welch* (1993) 5 Cal.4th 228, 237 [unpreserved challenge to reasonableness of probation conditions forfeited].)

As it applies to sentencing error claims, there is a narrow exception to the forfeiture doctrine recognized by the high court for sentences that are not authorized under the law. As the Supreme Court explained in *People v. Smith* (2001) 24 Cal.4th 849, 852, "We have . . . created a narrow exception to the waiver rule for ' "unauthorized sentences" or sentences entered in "excess of jurisdiction." ' [Citation.] Because these sentences 'could not lawfully be imposed under any circumstance in the particular case' [citation], they are reviewable 'regardless of whether an objection or argument was raised in the trial and/or reviewing court.' [Citation.] We deemed appellate intervention appropriate in these cases because the errors presented 'pure questions of law' [citation], and were ' "clear and correctable" independent of any factual issues presented by the record at sentencing.' [Citation.] In other words, obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings are not waivable."

Defendant has forfeited his constitutional and statutory challenges under section 4019 because he failed to raise them below. (*People v. Alexander*, *supra*, 49 Cal.4th at p. 880, fn. 14; *People v. Burgener*, *supra*, 29 Cal.4th at p. 861, fn. 3.) But he argues that we should nonetheless address his constitutional and statutory challenges because they present "pure question[s] of law." He cites *In re Sheena K.* (2007) 40 Cal.4th 875, 888 (*Sheena K.*) in support of this assertion. There, the high court held that the failure to object at sentencing did not forfeit a juvenile's claim that a probation condition was unconstitutionally vague and overly broad where the claim presented "a pure question of law, easily remediable on appeal by modification of the condition." (*Id.* at p. 888; see also *People v. Barajas* (2011) 198 Cal.App.4th 748, 753.) In so holding, the court noted

25

that such a constitutional challenge to a probation condition had some similarity to a "challenge to an unauthorized sentence that is not subject to the rule of forfeiture" because correction of errors in both instances "may ensue from a reviewing court's unwillingness to ignore 'correctable legal error.' [Citation.]" (*Id.* at p. 887.)

The constitutional and statutory claims here involve neither a probation condition nor a claimed unauthorized sentence, and we conclude that the "pure question of law" language of *Sheena K.* does not afford defendant grounds for reviewing forfeited claims. We therefore conclude that defendant's failure to raise these claims below has resulted in their forfeiture on appeal.

Defendant argues in the alternative that, were we to find that he forfeited his constitutional and statutory challenges, he is nonetheless entitled to relief because the failure to preserve them below constituted ineffective assistance of counsel. He argues that his trial counsel clearly erred in failing to object to the number of conduct credits awarded, and that this failure to object was prejudicial.

An ineffective assistance claim requires a showing that "counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial." (*People v. Seaton* (2001) 26 Cal.4th 598, 666, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "[T]he burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288; see also *People v. Weaver* (2001) 26 Cal.4th 876, 961.) "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437 (*Lucas*), quoting *Strickland*, *supra*, 466 U.S. at p. 689.) If "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," we must reject the claim on appeal "unless counsel was asked for an

26

explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.).)

We will address the merits of defendant's (otherwise forfeited) appellate contentions that he is entitled to additional conduct credits in the context of an ineffective assistance claim, i.e., whether the claims are substantively meritorious and therefore should have been asserted by trial counsel.

### B. Background Concerning Section 4019

Section 4019 permits a criminal defendant to earn additional credit prior to being sentenced by performing assigned labor (§ 4019, subd. (b)(1)) or by his or her good behavior during detention (§ 4019, subd. (c)(1)). Such credits are collectively referred to as "conduct credits." (*People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.) "The very purpose of conduct credits is to foster constructive behavior in prison by reducing punishment." (*People v. Lara* (2012) 54 Cal.4th 896, 906 (*Lara*).) Section 4019 has undergone a series of revisions since 2009. (See generally *People v. Garcia* (2012) 209 Cal.App.4th 530, 535-540.)

Senate Bill No. 18 (2009-2010 3d Ex. Sess.), enacted in October 2009, amended section 4019, effective January 25, 2010, to enhance the number of presentence conduct credits for certain offenders. (Stats. 2009, 3d Ex. Sess., ch. 28, § 50, p. 4427; the January 2010 amendment.) Under the pre-January 2010 formula for calculating credits under section 4019, a defendant could accrue conduct credit of two days for every four days of actual presentence custody. (Stats. 1982, ch. 1234, § 7, p. 4554 [former § 4019, subd. (f).) Under the January 2010 amendment, a qualifying defendant—persons other than those required to register as sex offenders, or those being committed to prison for, or who had suffered prior convictions of, serious felonies as defined in section 1192.7 or violent felonies as defined in section 667.5—could accrue conduct credit of two days for every

27

two days of presentence custody, twice the previous rate.  (Stats. 2009-2010, 3d Ex. Sess., ch. 28, §§ 50, 62 [Pen.Code, former § 4019, subds. (b), (c), & (f) ].)

The statute was again amended by Senate Bill 76, effective September 28, 2010, to restore the two-for-four conduct credit calculation less favorable to defendants that had been in effect prior to January 25, 2010 (Stats. 2010, ch. 426, § 2).  This amendment applied to persons in local custody for crimes committed on or after September 28, 2010. (Former § 4019, subd. (g), as amended by Senate Bill 76.)

And then, as part of the Realignment Act, the Legislature amended section 4019 a third time in Assembly Bill 109 (2011-2012 Reg. Sess.; Assembly Bill 109).  Assembly Bill No. 109, which amended section 4019 effective July 1, 2011, authorized conduct credit for all local prisoners at the rate of two days for every two days spent in local presentence custody.  (§ 4019, subds. (b) & (c), as amended by Stats. 2011, ch. 15, § 482.)  Like the previous amendment to section 4019, the amendment in Assembly Bill 109 was to have prospective application only.  (*Ibid.*)  But before July 1, 2011—the operative date of Assembly Bill No. 109—Governor Brown signed Assembly Bill No. 117 (2011-2012 Reg. Sess.), which retained the enhanced conduct credit formula but changed the effective date to October 1, 2011.  (Former § 4019, subd. (h), as amended by Stats. 2011-2012, ch. 39, § 53.)  On September 20, 2011, Governor Brown signed Assembly Bill No. 1X 17 (2011-2012 1st Ex. Sess.), the current version of section 4019 (hereafter, the October 2011 amendment), which retains the enhanced conduct credit provision—four days is deemed to have been served for every two days spent in actual custody.  (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 12, § 35; § 4019, subd. (f).)  The statute expressly states that it is to apply prospectively.  (§ 4019, subd. (h).)[15]

---

[15] "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011.

*(continued)*

28

C.    Equal Protection Challenge

The court awarded defendant 130 days of custody credits and 64 days of conduct credits for a total of 194 presentence credits.  Defendant contends on appeal that his conduct credits should have been calculated under the one-for-one formula of the October 2011 amendment to section 4019.  He asserts that, based upon the recalculation of conduct credits under this more favorable formula, and taking into account allegedly excess time he served in county jail to complete the condition of his probation that he serve 250 days, he should be awarded an additional 86 days of credit for time served.

Defendant acknowledges that under the pre-October 2011 version of section 4019, his presentence conduct credits would be calculated on a one-for-two basis.  But he contends that the failure to give retroactive application to the October 2011 amendment constitutes a violation of the equal protection clauses of the federal and state Constitutions (U.S. Const., 6th Amend.).[16]  He claims that he, as a defendant who committed a crime before October 1, 2011 (i.e., on September 23, 2011), but who was incarcerated after that date, is similarly situated to an inmate who is in custody for committing a crime after October 1, 2011, and that there is no rational basis to justify the alleged disparate treatment between these two groups.  Therefore, he argues, in order to avoid a violation of equal protection, the October 2011 amendment should be given retroactive application in his case.  We reject this constitutional challenge.

The first prerequisite for a successful equal protection argument is " 'a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.'  [Citations.]"  (*People v. Hofsheier* (2006) 37 Cal.4th

---

Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."  (§ 4019, subd. (h).)

[16] Defendant notes that he "is raising the equal protection argument solely under the federal Constitution in order to preserve [his] right to federal review of the claim."

29

1185, 1199 (*Hofsheier*), quoting *In re Eric J.* (1979) 25 Cal.3d 522, 530.) This inquiry by the court "is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) The second requirement is that the challenger establish that there is no rational relationship to a legitimate state purpose for the state's having made a distinction between the two similarly situated groups. (*Hofsheier*, at pp. 1200-1201.)[17]

Last year, our Supreme Court decided in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*) that prospective application of the January 2010 amendment of section 4019 did not violate equal protection principles, concluding that amendment did not create two similarly situated groups. The Supreme Court noted that the "important correctional purposes of a statute authorizing incentives for good behavior [citation] are not served by rewarding prisoners who served time before the incentives took effect and thus could not have modified their behavior in response. That prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows." (*Brown*, *supra*, 54 Cal.4th at pp. 328-329.)[18]

---

[17] Of course, there are three potential standards by which to measure the challenged classifications under an equal protection analysis—strict scrutiny, rational basis, and an intermediate level of review applicable to gender classifications. (*Hofsheier*, *supra*, 37 Cal.4th at p. 1200.) Legislation is usually subjected to a rational basis analysis. (*Ibid.*) This is the appropriate analysis here.

[18] In rejecting the defendant's equal protection claim, the high court in *Brown* distinguished two cases upon which the defendant relied (and upon which defendant here relies). In *In re Kapperman* (1974) 11 Cal.3d 542, 545 (*Kapperman*), the court held that former section 2900.5, which awarded presentence custody credit only to individuals delivered to the Director of Corrections by the statute's effective date, bore no rational relationship to a legitimate government purpose. The *Brown* court held that *Kapperman* was inapposite because it concerned only presentence *custody* credits, a very different circumstance from *conduct* credits. (*Brown*, *supra*, 54 Cal.4th at p. 330.) In *People v. Sage* (1980) 26 Cal.3d 498, 508 (*Sage*), the court held that a provision allowing presentence conduct credit for misdemeanants but not felons violated equal protection

*(continued)*

In *People v. Kennedy* (2012) 209 Cal.App.4th 385, we addressed the identical equal protection challenge to the October 2011 amendment to section 4019 raised by defendant here. While we acknowledged that *Brown*, *supra*, 54 Cal.4th 314, involved a prior amendment to section 4019 (*Kennedy*, at p. 396), we rejected the defendant's contention that he (Kennedy)—who committed his crime on March 11, 2011 (*id.* at p. 388)—was similarly situated with persons in jail who had committed crimes on or after the October 1, 2011 operative date of the challenged amendment to section 4019: "[T]he reasoning of *Brown* applies with equal force to the prospective-only application of the current version of section 4019." (*Id.* at p. 397; but see *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 53-54 (*Rajanayagam*) [distinguishing *Brown* by finding two groups were similarly situated with respect to equal protection challenge to October 2011 amendment]; *People v. Verba* (2012) 210 Cal.App.4th 991, 995-996 (*Verba*) [same].)[19]

Furthermore, the California Supreme Court, one month after deciding *Brown*, applied *Brown*'s analysis involving the January 2010 amendment to a defendant's argument that the October 2011 amendment should apply retroactively. Although addressed only in a footnote, the high court rejected the defendant's contention that the prospective application of the October 2011 amendment violated equal protection: "Today local prisoners may earn day-for-day credit without regard to their prior convictions. (See § 4019, subds. (b), (c) & (f), as amended by Stats. 2011, ch. 15, § 482.)

principles. The *Brown* court held that *Sage* did not stand for the proposition that defendants subject to the version of section 4019 predating the January 2010 were similarly situated with those receiving conduct credits under the January 2010 amendment. (*Brown*, at pp. 329-330.)

[19] Although the *Rajanayagam* and *Verba* courts found that the "similarly situated" prong had been met, the defendants' equal protection challenges in both cases nonetheless failed because the courts found that a rational basis existed for the October 2011 amendment's disparate treatment of the two groups. (*Rajanayagam*, *supra*, 211 Cal.App.4th at pp. 54-56; *Verba*, *supra*, 210 Cal.App.4th at pp. 996-997.)

31

This favorable change in the law does not benefit defendant because it expressly applies only to prisoners who are confined to a local custodial facility '*for a crime committed on or after October 1, 2011.*' (§ 4019, subd. (h), italics added.) [¶] Defendant argues the Legislature denied equal protection [citations] by making this change in the law expressly prospective. We recently rejected a similar argument in *People v. Brown* (2012) 54 Cal.4th 314, 328-330.) . . . Accordingly, prisoners who serve their pretrial detention before such a law's effective date, and those who serve their detention thereafter, are not similarly situated with respect to the law's purpose. (*Brown*, at pp. 328-329.)" (*Lara*, *supra*, 54 Cal.4th at p. 906, fn. 9.) We thus reject defendant's equal protection challenge because he cannot establish that he was similarly situated with persons who commit crimes on or after October 1, 2011.

Even were we to conclude that defendant is similarly situated with persons in jail who had committed crimes on or after the October 1, 2011 operative date of the challenged amendment to section 4019, his equal protection challenge fails. As noted, no equal protection violation will be found "if the challenged classification bears a rational relationship to a legitimate state purpose. [Citation.]" (*Hofsheier*, 37 Cal.4th at p. 1200.) The court's inquiry is completed "[w]here there are 'plausible reasons' for [the classification]." (*Id.* at p. 1201.) As we held in *Kennedy, supra,* 209 Cal.App.4th at page 397, there is a plausible reason for the statutory classification challenged here.

As we explained in *Kennedy*: "[O]ur Supreme Court has acknowledged [that] 'statutes lessening the punishment for a particular offense' may be made prospective only without offending equal protection principles. (*Kapperman*, *supra*, 11 Cal.3d. at p. 546.) . . . [¶] In *People v. Floyd* (2003) 31 Cal.4th 179 (*Floyd*), the defendant sought to invalidate a provision of Proposition 36 barring retroactive application of its provisions for diversion of nonviolent drug offenders. (*Id.* at pp. 183-184.) The court reiterated that the Legislature may preserve the penalties for existing offenses while ameliorating punishment for future offenders in order to ' "assure that penal laws will maintain their

32

desired deterrent effect by carrying out the original prescribed punishment as written." '
(*Id.* at p. 190.) The statute before the court came within this rationale because it
'lessen[ed] punishment for particular offenses.' (*Ibid.*) As the *Floyd* court noted, ' "[t]he
14th Amendment does not forbid statutes and statutory changes to have a beginning, and
thus to discriminate between the rights of an earlier and later time." [Citation.]' (*Id.* at
p. 191.) [¶] 'The very purpose of conduct credits is to foster constructive behavior in
prison by reducing punishment.' (*People v. Lara* (2012) 54 Cal.4th 896, 906.) As our
Supreme Court accepted in *Brown*, *supra*, 54 Cal.4th 314, 'to increase credits reduces
punishment.' (*Id.* at p. 325, fn. 15.) [¶] We gather that the rule acknowledged in
*Kapperman* and *Floyd* is that a statute ameliorating punishment for particular offenses
may be made prospective only without offending equal protection, because the
Legislature will be supposed to have acted in order to optimize the deterrent effect of
criminal penalties by deflecting any assumption by offenders that future acts of lenity
will necessarily benefit them. [¶] . . . [¶] Although the statute at issue here does not
ameliorate punishment for a particular offense, it does, in effect, ameliorate punishment
for all offenses committed after a particular date. By parity of reasoning to the rule
acknowledged by both the *Kapperman* and *Floyd* courts, the Legislature could rationally
have believed that by making the 2011 amendment to section 4019 have application
determined by the date of the offense, they were preserving the deterrent effect of the
criminal law as to those crimes committed before that date. . . . We see nothing irrational
or implausible in a legislative conclusion that individuals should be punished in
accordance with the sanctions and given the rewards (conduct credits) in effect at the
time an offense was committed." (*Kennedy, supra,* 209 Cal.App.4th at pp. 398-399, fn.
omitted.) Therefore, even had defendant satisfied the "similarly situated" requirement for
an equal protection claim, his challenge to the October 2011 amendment nonetheless fails
because the classification between persons—those committing an offense prior to
October 1, 2011, and those committing an offense on or after that date—bears a rational

relationship to a legitimate state purpose. (*Kennedy, supra,* 209 Cal.App.4th at pp. 397-399; accord, *Rajanayagam, supra,* 211 Cal.App.4th at pp. 54-56; *Verba, supra,* 210 Cal.App.4th at pp. 996-997.)[20] Accordingly, since defendant's equal protection argument lacks merit, his ineffective assistance claim, based upon the failure to assert this unmeritorious argument below, also fails.

### D. Statutory Construction Claim

Defendant claims that as a matter of statutory interpretation, he is entitled to the benefit of one-for-one conduct credits under the October 2011 amendment to section 4019 for all days spent in custody after October 1, 2011. By his calculation, he is entitled to an additional 78 days of credit for time served. He claims, citing a case that is now depublished (*Olague, supra,* 205 Cal.App.4th 1126, review granted Aug. 8, 2012, S203298, review dismissed Mar. 20, 2013), that a proper application of subdivision (h) of section 4019 compels this conclusion.

We rejected this argument in *Kennedy, supra,* 209 Cal.App.4th at pages 399 to 400. "We reiterate that according to the explicit language of the statute, the [October] 2011 amendment to Penal Code section 4019 applies only to crimes that were 'committed on or after October 1, 2011.' (Pen.Code, § 4019, subd. (h).)" (*Id.* at p. 399.) Similarly, the court in *Rajanayagam, supra,* 211 Cal.App.4th at page 51 rejected an argument that the second sentence of section 4019, subdivision (h), "implies any days earned by a defendant after October 1, 2011, shall be calculated at the rate required by the current

---

[20] We note that there are two cases, now depublished, addressing the question of retroactivity of the October 2011 amendment to section 4019 that were pending before the Supreme Court when this case was being briefed. In those cases, the high court granted review, issued orders deferring briefing pending the finality of its decision in *Brown, supra,* 54 Cal.4th 314, and thereafter dismissed review. (See *People v. Olague* (2012) 205 Cal.App.4th 1126, review granted Aug. 8, 2012, S203298, review dismissed Mar. 20, 2013 (*Olague*); *People v. Borg* (2012) 204 Cal.App.4th 1528, review granted Jul. 18, 2012, S202328, review dismissed Mar. 20, 2013.)

law, regardless of when the offense was committed." It concluded that such an interpretation would render meaningless the language in the first sentence (*ibid.*), which provides that the changes to the accrual of presentence conduct credit "shall apply prospectively and shall apply to prisoners who are confined to a county jail . . . for a crime committed on or after October 1, 2011." (§ 4019, subd. (h).) The court in *Rajanayagam* concluded that adopting the defendant's interpretation would violate an elementary rule requiring courts, if possible, to ascribe meaning to every word, phrase, and sentence of a statute and to avoid interpretations that render some words superfluous. (*Rajanayagam*, at p. 51.)

We too conclude that defendant is not entitled to the enhanced presentence conduct credits provided in the October 2011 amendment for the time that he was in custody after October 1, 2011, because of any perceived ambiguity in subdivision (h) of section 4019. (Accord, *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1552-1553.) Therefore, since defendant's statutory argument is without merit, his ineffective assistance claim, based upon the failure to assert this unmeritorious argument below, also fails.

IV.    Probation Conditions

A.    Applicable Law

The court may grant probation "upon those terms and conditions as it shall determine." (§ 1203.1, subd. (a).) "In granting probation, courts have broad discretion to impose conditions to foster rehabilitation and to protect public safety pursuant to Penal Code section 1203.1. [Citations.]" (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120-1121.) "The court may impose and require . . . [such] reasonable conditions[ ] as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer." (§ 1203.1, subd. (j).) Although the trial court's discretion is broad, it is

35

not unlimited; a probation condition must serve a purpose specified in the statute. (*People v. Carbajal*, at p. 1121.)  In addition, our high court has interpreted section 1203.1 to require that probation conditions which regulate conduct "not itself criminal" be "reasonably related to the crime of which the defendant was convicted or to future criminality."  (*People v. Lent* (1975) 15 Cal.3d 481, 486, superseded by statute on another ground as stated in *People v. Wheeler* (1992) 4 Cal.4th 284, 290–295.)

Both adult offenders and juveniles may challenge a probation condition on the grounds that it is unconstitutionally vague or overly broad.  (See *Sheena K.*, *supra*, 40 Cal.4th at p. 887.)  As we have explained:  "Although the two objections are often mentioned in the same breath, they are conceptually quite distinct.  A restriction is unconstitutionally vague if it is not ' "sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated." '  [Citation.]  A restriction failing this test does not give adequate notice—"fair warning"—of the conduct proscribed.  [Citations.]  A restriction is unconstitutionally overbroad, on the other hand, if it (1) 'impinge[s] on constitutional rights,' and (2) is not 'tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation.'  [Citations.]  The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement."  (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153; see also *In re Victor L.* (2010) 182 Cal.App.4th 902, 910.)

Any objection to the reasonableness of a probation condition is forfeited if not raised at the time of imposition.  (See *In re Justin S.* (2001) 93 Cal.App.4th 811, 814; see also *Sheena K.*, *supra*, 40 Cal.4th at p. 883, fn. 4; *People v. Welch* (1993) 5 Cal.4th 228, 237.)  Constitutional challenges to probation conditions on their face, however, may be raised on appeal without objection in the court below.  (*Sheena K.*, at pp. 887-889.)

### B. Drugs and Alcohol, and Weapons Conditions

Defendant challenges two probation conditions imposed by the court. One condition relates to drugs and alcohol, and reads: "Not use or possess alcohol/narcotics, intoxicants, drugs, or other controlled substances without the prescription of a physician; . . ." He also challenges a second condition which reads: "Not possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon. . . ." He contends that both conditions are defective because they do not include an actual knowledge requirement. He argues that the conditions are "unduly vague because appellant may unknowingly use or possess controlled substances, or unknowingly possess a dangerous weapon." The Attorney General indicates that she does "not object to modification of these two probation conditions by adding a knowledge requirement."

The minor did not raise this challenge below. But because his claim is that the probation condition is unconstitutional, it is cognizable on appeal. (*Sheena K.*, *supra*, 40 Cal.4th at pp. 887-889.)

"A probation condition 'must be sufficiently precise for the probationer to know what is required of him [or her], and for the court to determine whether the condition has been violated,' if it is to withstand a [constitutional challenge on the ground of vagueness. [Citation.]" (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) As we have observed, "[I]n a variety of contexts . . ., California appellate courts have found probation conditions to be unconstitutionally vague or overbroad when they do not require the probationer to have knowledge of the prohibited conduct or circumstances." (*People v. Kim* (2011) 193 Cal.App.4th 836, 910.) Thus, probation conditions that fail to include language requiring the probationer's knowing violation of the condition have been invalidated in the context of prohibitions on association with felons, ex-felons, or narcotics dealers or users (*People v. Garcia* (1993) 19 Cal.App.4th 97, 102); association with gang members (*People v. Lopez* (1998) 66 Cal.App.4th 615, 628); association with probationers, parolees, or gang

37

members (*In re H.C.* (2009) 175 Cal.App.4th 1067, 1071); association with persons under 18 (*People v. Turner* (2007) 155 Cal.App.4th 1432, 1437); frequenting areas of gang-related activity (*People v. Leon* (2010) 181 Cal.App.4th 943, 952); possessing stolen property, or possessing firearms or ammunition (*People v. Freitas* (2009) 179 Cal.App.4th 747, 751-752); and possessing, wearing or displaying gang-affiliated material (*In re Vincent G.* (2008) 162 Cal.App.4th 238, 247-248).

We will therefore order the probation conditions modified to include specific knowledge requirements. (*Sheena K.*, *supra*, 40 Cal.4th at p. 892 ["modification to impose an explicit knowledge requirement is necessary to render [a probation] condition constitutional"].) We will order the challenged drugs/alcohol probation condition modified to read (with the modification italicized): "Not *knowingly* use or possess alcohol/narcotics, intoxicants, drugs, or other controlled substances without the prescription of a physician; . . ." We will order further that the first sentence of the challenged weapons probation condition be modified to read (with the modification italicized): "Not *knowingly* possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon. . . ."

## DISPOSITION

The order of probation is modified: (1) As to the probation condition concerning drugs and alcohol, it shall be modified to read: "Not knowingly use or possess alcohol/narcotics, intoxicants, drugs, or other controlled substances without the prescription of a physician; not traffic in, or associate with persons known to defendant to use or traffic in narcotics or other controlled substances." (2) As to the probation condition concerning weapons, the first sentence thereof shall be modified to read: "Not knowingly possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon. . . ." As modified, the order of probation is affirmed.

38

_____

                    Márquez, J.


WE CONCUR:



_____

        Elia, Acting P.J.







_____

        Bammatre-Manoukian, J.




People v. Turner
H037925

| Trial Court: | Monterey County |
| | Superior Court No.: SS111816 |

| Trial Judge: | The Honorable Mark E. Hood |

| Attorney for Defendant and Appellant Ronald Henderson Turner: | Jonathan B. Opet under appointment by the Court of Appeal for Appellant |

| Attorneys for Plaintiff and Respondent The People: | Kamala D. Harris, Attorney General |
| | Dane R. Gillette, Chief Assistant Attorney General |
| | Gerald A. Engler, Senior Assistant Attorney General |
| | Rene A. Chacon, Supervising Deputy Attorney General |
| | Bruce Ortega, Deputy Attorney General |

People v. Turner
H037925